**SMITH**

v.

**ACADIA OVERSEAS FREIGHTERS,**
Limited et al.

**THE VICTORIA COUNTY.**

No. 103 of 1950.

United States District Court,
E. D. Pennsylvania.

May 17, 1954.

See also, 120 F.Supp. 192.

Herman Moskowitz, Stark & Goldstein, Philadelphia, Pa., for libellant.

Harrison G. Kildare, Rawle & Henderson, Philadelphia, Pa., for respondents.

FOLLMER, District Judge.

This case is presently before the Court on remand from the Court of Appeals, 3 Cir., 202 F.2d 141, with direction that the record of a previous trial should be enlarged by any available pertinent evidence.

From the testimony educed at the first and at the second and enlarging trial, I make the following

### Findings of Fact

1. The respondent corporation, organized under the laws of Canada, operated and controlled the Steamship "Victoria County" at all times material to this action.

2. During the month of December 1948, while at the Port of Philadelphia, the vessel contracted for the services of Thomas A. Winters Ship Engineering Company, an independent contractor, for a general overhauling including the cleaning of the holds. This operation started while the ship was in dock at Port Richmond, Philadelphia, and was conclud-ed while the ship was at the yard of Sun Shipbuilding and Dry Dock Company near Chester, Pennsylvania. Libellant was employed by Thomas A. Winters Ship Engineering Company as a laborer to assist in the cleaning work.

3. No written contract was entered into between the ship and the Winters Company.

4. Item No. 42 of the invoice covering all the work done on the ship by Winters Company contained the following,

"42 Cleaning cargo holes
Furnish all labor and material necessary to clean all cargo holes by sweeping, wiping, wire-brushing, scraping and chipping frozen iron ore, and dispose of all excess material. Overtime included . .2,894.00"

5. On December 29, 1948, the libellant and a fellow employee identified only as "Pork Chop" were cleaning the lower No. 4 hold, which was approximately 30 feet from deck to ceiling.[1] In order to sweep off the beams supporting the deck above them, these men required the use of a ladder to reach the under side of the beams. While standing at the bottom of the hold, they called to other employees of Thomas A. Winters Ship Engineering Company who were working on the main deck to furnish them a ladder. The ladder was lowered to them by the winchman, who was also a fellow employee of the Winters Company.

6. The ladder involved in this case was one of two ladders supplied for this operation by Thomas A. Winters Ship Engineering Company. It was a wooden extension ladder consisting of two sections and having an overall or extended length of 40 feet. The extension was effected by a rope in the center of the ladder which was operated through pulleys. When extended the upper section was held in place by two metal catches or brackets called "safeties", one on either

---

[1] Testimony of various witnesses estimated the depth of the hold from 25 feet to 35 feet. Libellant testified that the hold was about as deep as Courtroom No. 4 in which this trial was held. A check disclosed that the highest point in this courtroom is 21 feet 9 inches from the floor.

side of the extended section. The rope also served as an extra safety precaution by being tied to a rung when the ladder was extended.

7. Libellant and his fellow employee extended the ladder, and "Pork Chop" mounted to the top to clean the beams. The libellant stayed below on the bottom of the hold to steady the ladder. When it was necessary to move the ladder, "Pork Chop" descended to the bottom of the hold and the two men together shifted the ladder while it was still in an extended position.

8. In order to grasp the ladder firmly to move it, the libellant placed his hands at the sides of the ladder and his left thumb was on one rung of the lower section. While the ladder was being moved, the upper section dropped down and the catch or bracket jammed libellant's left thumb against the rung of the lower section.

9. After the ladder telescoped and jammed libellant's thumb, he fell on the deck of the hold and the ladder fell with him.

10. Libellant at no time, either before or after the accident, inspected the ladder and he made no use of the rope as a means of securing the ladder when extended.

11. The extension ladder in question was practically new, in excellent condition, and free of defects; it had been used from the beginning of this general overhauling action at Philadelphia; it was examined by officials of the Engineering Company after the accident and the catches or safeties were found in perfect shape, and the ladder was immediately put to further use.

12. The employer's report of Thomas A. Winters Ship Engineering Company to the Deputy Commissioner of Accident or Occupational Disease filed under the provisions of the Longshoremen's and Harbor Workers' Compensation Act stated that its foreman first had knowledge of libellant's injury at 2:00 o'clock P. M., December 29, 1948. The report card of the dispensary of Sun Shipbuilding and Dry Dock Company indicated that libellant was there examined at 3:05 o'clock P. M., December 29, 1948, and the records of Chester Hospital indicated that he was admitted at that institution at 3:21 o'clock P. M. December 29, 1948. I find that these records correctly state the facts and that the accident occurred between 1:00 o'clock P. M. and 2:00 o'clock P. M., December 29, 1948.

13. All of the hatches over the No. 4 hold were open through which daylight entered, and electric lights were lit in the corners of the hold. Under all of the evidence the lighting in the hold at the time of the accident was adequate.

14. The hold in question had received a cleaning at Port Richmond but not sufficiently thorough to meet the required approval of the inspectors preparatory to loading a cargo such as grain. There still remained a small residue of iron ore dirt which was being cleaned off the beams with a whisk broom and small shovel and placed in buckets. The nature and quantity of the iron ore dirt was not such as to require the use of an air hose for its removal, nor did it create sufficient dust to call for the use of blowers.

## Discussion

Following the retrial of this case, to wit, on April 5, 1954, the Supreme Court handed down its per curiam opinion in Alaska Steamship Company, Inc., v. Petterson, 347 U.S. 396, 74 S.Ct. 601. This opinion, in effect, extended the doctrine of absolute liability for unseaworthiness by making the ship owner liable for injuries sustained by an employee of an independent contractor on board ship while engaged in the loading of the ship where the injuries were caused by a breaking block brought on board by the independent contractor.

In the instant case, the ladder in question was brought on the ship by the independent contractor in the furtherance of the contractor's operation and in the use of which one of its employees was injured.

It is libellant's contention that he and his fellow employee, "Pork Chop," were

assigned by their employer, Thomas A. Winters Ship Engineering Company, to clean the No. 4 hold of the ship "Victoria County." In order to sweep off the beams supporting the deck above them, they required the use of a ladder to reach the under side of the beams. While standing at the bottom of the hold, they called to other employees of Thomas A. Winters Ship Engineering Company who were working on the main deck to furnish them with a ladder. The winchman, a fellow employee, lowered to them an extension ladder consisting of two sections with an overall or extended length of 40 feet. Libellant and "Pork Chop" extended the ladder, "Pork Chop" mounted the ladder to clean the beams and libellant remained below on the deck of the hold to steady the ladder. When it became necessary to move the ladder, "Pork Chop" descended to the deck of the hold and the two men together shifted the ladder while it was still in an extended position. It was during this moving operation that the upper section of the ladder dropped and the catch or safety jammed libellant's left thumb against the rung of the lower section. Libellant placed the time of the accident at various times, i. e., "late part of the evening," "past dinnertime," "it was after five o'clock," and it was "getting dark." He also insisted that there was a large accumulation of coal dirt in the hold and that when the beams were swept the dust was so thick he could not see. He admitted that the hatches were all open and that the daylight penetrated through to the hold, but that the day was not too bright. He denied that there were any artificial lights lit in the hold. In regard to the lights, there was convincing testimony that artificial lights were lit in the corners of the hold.

As to the nature of the dirt in the hold, it is interesting to note that the invoice submitted by Winters covered the "sweeping, wiping, wire-brushing, scraping and chipping frozen iron ore." This is confirmatory of other evidence in the case that the material being removed from the beams in the hold consisted of iron ore dirt and not coal dust.

I am convinced that the accident occurred in the very early afternoon. Libellant's foreman reported he first knew of it at 2:00 o'clock P. M.; libellant testified that he arrived at the dispensary about one and one-half hours after the accident, and the dispensary records indicated he was there examined at 3:05 o'clock P. M.; the Chester Hospital records have him admitted there at 3:21 o'clock P. M.

Libellant contends he "hollered up" to the winchman three times for lights. Whether or not he did so, there is absolutely no testimony that the winchman, a fellow employee of Winters, ever relayed those requests to any one of the ship's personnel, but in considering all the testimony, it is clear that the hold was adequately lit for the operation which they were performing.

There is a vast difference between the facts of the Alaska Steamship case, supra, and the instant case. In the former the block in question broke. In this case I can find nothing wrong with the ladder. Consequently, so far as the ladder is concerned, I can find no element of unseaworthiness. Libellant bases his entire case on the fact that the catches or safeties, the purpose of which was to hold the extended portion of the ladder secure, slipped, as the result of which his thumb was caught. He repeatedly testified that the extension portion of the ladder came down first on his thumb and that he then slipped and went down with the ladder, that when the ladder came down, "I had to fall right down with it."

There was uncontradicted testimony that this ladder had been used on this operation from the time it started at the Port Richmond dock in Philadelphia, and was continued in use after the accident. Certainly, according to libellant's own testimony, the catches or safeties performed their proper functions when "Pork Chop" was on the ladder. The accident did not happen until libellant and "Pork Chop" were moving it. "Pork

Chop" was not called as a witness. If the libellant's thumb was injured as he claims by being caught in the catch or safety, then it must have been the result of the negligence or carelessness either of himself or his fellow employee (Winters' employee). Clearly, an improper use of a perfect piece of equipment by an employee of an independent contractor, which furnished the equipment, would not form the basis of a claim of unseaworthiness against the ship on which an accident occurred as the result of such improper usage.

I have found as a fact that under all of the evidence the lighting in the hold at the time of the accident was adequate.

Whether or not libellant slipped on the accumulation of dirt on the floor of the hold is immaterial, as according to libellant's testimony the fall had nothing to do with the injury. In no sense was the condition of the floor a contributing factor to the accident.

██ Nor, in my opinion, is there any basis for the application of the doctrine of res ipsa loquitor. It is fundamental that for this doctrine to apply the defendant must have had full management and control of the instrumentality which caused the injury.[2]

██ The ship is not an insurer and even the sweeping coverage of the Alaska Steamship case is predicated on the element of unseaworthiness which in my opinion is totally and completely lacking in this case. I can reach no other conclusion than that this libellant suffered his injury through his own negligence and carelessness in the handling of a perfect piece of equipment furnished by his employer, the independent contractor, and equipped with adequate safety devices which he did not use.

## Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter.

2. Shain, "Res Ipsa Loquitor," Page 280. Here the ladder was under the exclusive

2. The libellant's evidence was insufficient in law to make out a prima facie case of liability against the shipowner.

3. The sole, direct and proximate cause of the libellant's injury was his own negligence.

A decree may be submitted in accordance with the foregoing Findings of Fact and Conclusions of Law.

management and control of the libellant and his fellow employee.